and U.S. Bank National Association against Wilmington Savings Fund Society. May it please the Court, my name is Roy Englert. I represent the appellants, the subordinated note holders. This is, of course, a contract case. The relevant contract, the 2006 indenture, uses the phrase subordinated in right of payment ten times. One of those uses is in the base definition of senior indebtedness. The fourth proviso to the definition of senior indebtedness, however, uses a very different phrase, subordinate or junior in any respect. The lower courts held that the two very different phrases mean the exact same thing. According to the lower courts, the fourth proviso does not apply unless the debt in question is subordinated in right of payment, or, in industry jargon, that subordinate or junior in any respect, just like the very different phrase used elsewhere, refers to payment subordination, not lien subordination. That conclusion was erroneous for two fundamental reasons. First, it's simply inconsistent with how the word any is always used. Second, it assigns no significance at all to a glaring difference in phrasing used by the drafters. The word any is actually used twice in the fourth proviso. Senior indebtedness does not include any indebtedness or obligation, quote, that by its terms is subordinate or junior in any respect to any other indebtedness or obligation of the company. The word any is used to connote maximum breadth. The second lien note holders cannot recover against the common collateral until after the senior lien note holders have been paid in full. That is subordination and junior status in an important respect to another indebtedness or obligation of the company. The literal words of the definition resolve this case all by themselves. But there's another reason to accord any its common meaning. If the drafters of the indenture had intended the reading the lower courts adopted, it would have been the easiest thing in the world to write the fourth proviso using the phrase subordinated and right of payment. That is the phrase used over and over again in this very indenture, including the definition section itself, to convey the meaning the lower courts ascribe to subordinate or junior in any respect. To treat such different phrases as having the exact same meaning is contrary to settled principles of contract interpretation. But counsel, not having used the phrase, you're asking us to unwind and to give some money from the second lien holders and redistribute it to others after this deal is pretty much consummated? Yes, Your Honor. Both the lower courts in denying a stay said because all this would require is a recalibration of the recoveries of two sets of creditors, it is very unlikely that the case would be held equitably moot on appeal. So that is the remedy we're asking. Now, the lower court's interpretation ascribes no meaning to in any respect. It ascribes no meaning to or junior. It makes the entire fourth proviso a bespoke provision drafted specifically for this indenture, devoid of any content separate from the base definition. Another powerful indication that the drafters actually intended to treat lien subordination as precluding debt from being considered senior indebtedness is Section 1.04 of the indenture, Rules of Construction. Annex I to the blue brief contains a comparison of Sections 1.04 of the ABA model and the relevant moment of indenture. Paragraph after paragraph of that provision was copied verbatim, but Paragraph 7 was struck. That paragraph would have provided that, quote, shall not be deemed to be subordinate or junior to any other secured indebtedness merely because it has a junior priority with respect to the same collateral. That's exactly what the lower courts held that this indenture means, but the wording that would have conveyed that meaning elusively is wording that the drafters chose to omit. Why are you citing to us wording that wasn't ultimately in the final contract? Because it would have accomplished exactly what the lower courts say this indenture did accomplish, and it was not used. Our case rests first and foremost on the text that is in the contract. In any respect, subordinate or junior in any respect. Our case rests on text. Our case rests on the contrast between subordinate or junior in any respect and the phrase subordinate in right of payment used throughout the indenture. But we have additional indications that this really is what the drafters intended, that in any respect was meant to mean in any respect because they could have accomplished the other side's reading, the lower court's reading, by using this paragraph, paragraph 7 from the ABA model indenture, which they otherwise copied verbatim for the most part, and they didn't. So we have a couple of indications that the drafters really did intend lean subordination to come within the meaning of the Fourth Proviso. It's not a great mystery where the phrase in any respect in the Fourth Proviso came from. Industry publications written shortly before the drafting of this indenture suggested using the phrase subordinated in any respect to capture the concept of lean subordination in addition to payment subordination. Yes, Fitch's suggestion. Looking beyond the parties that are here, is my understanding correct that there was other senior debt that had subordinated loans? Yes, Your Honor. Well, your approach calls into question the seniority of all of those parties, doesn't it? That's true enough, Your Honor, but since they recovered based on their security interests and not based on the unsecured portion of their debt, that's not where the action is. Okay. Now, the lower court's only real answer to the points I've been making was to say that the base definition would be rendered surplusage if the words subordinate or junior in any respect were given their natural meaning. There's an insurmountable problem with that answer. It renders the Fourth Proviso surplusage by giving it no work to do. If debt is subordinate in right of payment and thus falls within the lower court's construction of the Fourth Proviso, it's already excluded from senior indebtedness by operation of the base definition itself. Now, appellees try to answer that by saying it's the words by its terms, not the words subordinated or junior in any respect that give the Fourth Proviso some work to do. But to get there, they have to argue that something can be subordinated by its terms without being expressly subordinated, the words used in the base definition. The obvious problem is that by its terms and expressly mean the same thing in ordinary English usage and legal usage. So we have appellees in the lower courts insisting that two synonyms expressly and by its terms have two different meanings while two dramatically different phrases, subordinated in right of payment and subordinated or junior in any respect, have the same meaning. That's not a proper application of the canon against surplusage, which like most canons is meant to choose among different meanings that the words themselves can reasonably bear. Finally, the phrase is not just subordinated in any respect. The phrase is subordinated or junior in any respect. Junior is a word ordinarily associated with lien indebtedness, and we have yet another clue that when the drafters put together this bespoke provision in the Fourth Proviso, they intended to capture lien subordination, which is subordination in any respect. The proviso is introduced with the words provided, however. There is a case from the Appellate Division, Warburg Opportunities v. GeoResources, cited in our opening reply briefs, not responded to by appellees, that tells the Court how to deal with the contradiction between a main provision and something else introduced by notwithstanding any other provision or the equivalent phrase provided, however. The proviso prevails. What decree do you want? What's the remedy you want from us? The remedy is to send it back to the Bankruptcy Court to shift value from the second lien note holders to my clients, the subordinated note holders. Redistribute. You want to redistribute some of the money? Yes. Thank you. And we're talking about something on the order of, what, $150 million? Some fraction of $382 million. How much that fraction is is something the Bankruptcy Court would have to determine or remand, but the second lien note holders have $382 million in claims. Some of that is held by Apollo. Arguably, Apollo doesn't get to recover because it waived its right to recover by negotiating this agreement. So my clients have about $250 million, but it's some portion up to $250 million. Suppose Mr. Black says, no, I don't want to go for this. I don't want to give that money back. The parties are all before the Court and subject to the jurisdiction of the Court. They're all what? Before the Court and subject to the jurisdiction. What I'm getting at is the content power of the United States. It's not just the content power. I'm sorry. The question wasn't properly phrased. But one of the parties says, listen, I agree to this plan in contemplation of receiving the amount of money I did. But if I've got to give back the $150 million, won't the confirmation have to be revisited? Your Honor, again, the lower courts both said no recalibration will suffice in this case. And a theory in which recalibration will suffice in this case. And a theory in which any bargain that was struck in negotiating a consensual or partially consensual plan gives rise to equitable mootness proves too much. That would make every case of any complexity involving any negotiation equitably moot. That's never been the rule of law in this circuit. It can't be the rule of law. Thank you. Thank you very much. You've reserved two minutes. And Mr. Shah is up again. May it please the Court, Pratik Shah for Appellees. Maybe I'll just start with equitable mootness since that's where we just ended. And Judge Parker, to go to your question, it would not simply be okay to order what they call a recalibration, which is really asking for a disgorgement remedy two years after the plan has been consummated that would constitute a reversal of the fundamental compromise that was made that led to implementation of this plan. We're talking about a $380 million claim in which my clients made significant compromises in giving up a $1 billion, for example, giving up a $1 billion unsecured deficiency claim, backing a $600 million rights offering. All of those things were done there. And this Court in Metro Media and in In Re Charter Communications had the exact same request. The lenders in those cases said, look, this is just a disagreement between various parties. All you have to do is disgorge the money from one or recalibrate, take the money from one and give it to the other. What this Court said is disgorgement is not permitted. You have to vacate the existing plan and then see if the parties who made the fundamental compromise are still willing to make that fundamental compromise. That takes you back to square one. Is this the danger of frustrating the entire plan? Yes, Your Honor. That's exactly the reason why this case is equitably moot two years down the road. Doing that, giving the relief that they want, the sort of disgorgement remedy which would essentially require clawing back the distributions that were made over two years ago, at least from the— This Court didn't agree with that, did it? This Court in Metro Media and in Re Charter Communications said that sort of recalibration is not permitted. But remind me then what the district court's position was on equitable mootness. Your Honor, the district court didn't reach equitable mootness. It said that that's moot because it ruled for us on the merits. Now, what Mr. Engler referred to is he said it's likely not moot in the state proceedings, but there's no findings, there's no written opinion, there's nothing on that score. Now, Metro Media— Didn't Judge Drain at some point indicate that would not be a problem, equitable mootness would not be an issue? Somebody— Yes, they made the comment, which is exactly what I was just saying to Judge Barker. The comments were made by the bankruptcy court and district court. They didn't have to reach it because they ruled in our favor. They said there isn't a risk here because all you have to do, as Mr. Engler said, is recalibrate. The problem is in Metro Media and in Re Charter Communications, exact same argument was made to this court. There in Metro Media was one party said you gave the stock warrants to the wrong party. You should give it to us. All that requires is taking it back from them and giving it to us. And what this court said in Metro Media is no, we can't simply take out of one pocket and give to the other because that alters the fundamental assumptions that were made that led to the plan. You have to vacate the plan, which would take you back to square one. Maybe they would end up at the same place, but maybe not, and that would inject huge uncertainty to innocent parties, the employees of this revitalized company, the customers of this revitalized company, the vendors of this revitalized company. You go back, undo everything, and that's exactly the sort of thing, and that's why this court said it's equitably moot in Metro Media, in Re Charter Communications. Your adversaries had pursued equitable mootness all along, and you deployed against them some consistent and imaginative tactics to get us to this position. I mean, it's a little bit unsettling that someone who has argued equitable mootness all along will be prejudiced because you were skillful enough to buy yourself a couple of years. Well, Your Honor, the process itself, even without, I think, referring to the three-month delay, this court's rules provide for stays during a motion to dismiss for equitable mootness. Even if you subtract those three months out, you're close to two years. But I think the more fundamental point is we don't disagree that they did what they were supposed to do. They moved for the stay. They did all that. That's one of the five Chateauguay factors. This court's precedent is absolutely clear that there is a presumption of equitable mootness once a plan is consummated, and they must meet their burden on all five Chateauguay factors. They meet their burden on that Chateauguay factor. We don't dispute it. The problem is they don't meet the burden on the Chateauguay factors that go to whether this would unravel the bankruptcy plan and the underlying transaction and compromises that were made. That's what Metro Media and In-Ray Chartered Communications, and in In-Ray Chartered Communications, the party also took all the steps that they were supposed to take. The court said, no, it's equitably moot. Your Honor, if you do reach the merits, if I can say, if I can turn to the merits now, the subordinated note holders cannot point to any indenture that has ever been construed to deprive senior indebtedness of that status just because the debt has been secured by a junior lien. Adopting that unheard of construction here in contravention of the careful opinions of the bankruptcy and district court would be both legally and commercially untenable. Now, as a legal matter, their construction flouts a cardinal canon of construction by turning the entire exclusionary clause of the baseline definition of senior indebtedness into utter surplusage. That consequence is undisputed. The baseline definition would essentially define senior indebtedness as, quote, all indebtedness period because the rest of that definition would be swallowed up by their construction of the fourth proviso just to kind of make it more accessible. It's as if you had a sign for a casino that said, only adults over 21 are welcome, provided, however, that all children and adults are welcome. You would never have that sort of main proviso, which would be rendered nonsensical by the fourth proviso. That's what their construction does. That's not how we interpret contracts. Now, the subnotes— What do you think it in any respect means? Your Honor, we think in any respect means in any way. Is it payment subordinated in any way? And let me give you two concrete examples in which something might not be expressly subordinated in right of payment, but it's still subordinated of right of payment in at least some way or in any respect. But junior in common parlance refers to liens and not payment. Well, Your Honor, no. There's ample authority, and it's cited in our briefs and treatises. When you're talking about subordination in this—subordination of indebtedness, and remember the fourth proviso says the indebtedness would be subordinated. That refers to payment subordination, not lien subordination. And, Judge Parker, let me get to your practical point, which is absolutely correct, and this is undisputed. Their construction of this indenture leads to the startling result that not even the senior-most debt issued by the company here would be considered, quote, senior indebtedness under the definition of the indenture. And that's because all of the debt that the company has issued, including the senior-most debt, is secured by at least some sort of junior lien. And that's often the case for a—not just in this bankruptcy, but for most companies. That's often the case. You said no one would be junior. No one would be junior. The subordinated notes would be subordinated to none. That makes no commercial sense. Now, Your Honor, if there's one point that I'd like you to take away from this argument, it's the one I'm going to make here, which is about the model commentary. They rely heavily on the ABA model commentary. JA973 reproduces the model commentary, the provision that uses the exact in any respect language. We cite it at page 43 of our brief. They do not respond to it in their reply brief. They don't bring it up at argument here. It cuts the legs out of their construction of the in any respect clause. Here's what JA973 says. It says, here is the model clause we suggest that you put in indentures. Quote, the company shall not incur any indebtedness if such indebtedness is subordinate or junior in ranking in any respect. So it has the exact language, subordinate or junior in any respect. Commentary. Here's what the ABA says that means. The foregoing provision is designed to protect the relative priority of senior subordinated debt in that the company is not allowed to incur any debt that is contractually subordinated to any indebtedness. Contractual subordination, everyone agrees with this, is payment subordination. And if there's any ambiguity about that, here's the next line of the commentary. The equivalent provision in a senior note offering would read as follows. The company will not incur any indebtedness that is subordinated in right of payment to any other indebtedness of the company. So they say the exact clause that they quote from the ABA model rules that's in this indenture, subordinate or junior in any respect means payment subordination. It's crystal clear on the model indenture that they cite, JA973, that the clause refers only to payment subordination. If that is correct, then the very clause and the very model indenture that they're saying supports exactly the construction that the bankruptcy court and the district court reach, that we reach, that avoids surplusage, that avoids the nonsensical result that you would have no class of senior debt, and that the subordinated notes would be first in payment priority. You simply don't get to their model rule 1.4 rule of construction because there's nothing to construe when the main proviso on which they're relying on encompasses payment subordination. Let me ask you this. What weight or what dignity do you think we ought to ascribe to sources like, you know, Fitch or the ABA rules? Well, Your Honor, I think in cases where there is clear and established evidence that it is an industry norm, then I think weight can be given to those. But the bankruptcy court here took evidence on that. It had the Fitch commentary. It had the ABA model indentures. And it said, look, this is, and these were issued months, literally months before the indentures here were completed. And it said even the commentary in Fitch itself says this is a still, it remains to be seen what effect these model provisions will have. It's not clear. It's still emerging. And that's what the bankruptcy court found. It's still emerging. But even if you gave effect to the model provision, we invite you. How is this stuff different from a bankruptcy expert writing a law journal article? Right. You know, you're right, Your Honor. You can, the bankruptcy court is in a good position to weigh all of those competing models, evidence, experts, journals, and come to what is the correct construction. And again, they don't point to a single indenture that has, and they point to a lot of them, that has ever been construed to make senior indebtedness junior just because it is secured by a junior lien. And we invite you, go ahead and apply the ABA model indenture at JA 973, which says the exact clause that's used here, subordinate or junior in any respect, refers to payment subordination. Mr. Shah, just a final question, almost clerical in nature. Will you, you would agree that with the bankruptcy court that we have no precedent on the appropriate methodology here, so that if you prevail, if you prevail, that will be a path, it will be establishing an important principle, and it will also lead to a split in the circuits, right? No, Your Honor. They don't, and you can ask this to Mr. Engler, they don't allege any circuit split, any contrary precedent. There's no precedent on this issue. I mean, this has always been interpreted this way, and as I said, they don't point to any single indenture that's ever been interpreted in any way. Thank you. All right. Mr. Engler. On the very last points Mr. Shah made, he says this has always been interpreted this way. There's no other indenture with this language. There are lots of indentures with contrasting language that is clearly designed to accomplish the result Mr. Shah advocates and the lower courts found. Feel free to read pages 964 to 973 of the joint appendix. They do not support what Mr. Shah said, which is that this clause is interpreted this way by the ABA. The ABA model provision has a paragraph 7 in 1.04 Rules of Construction that would accomplish their result, and the commentary is on that provision, not on the provision we have. Black's Law Dictionary, quoted, block quoted on page 44 of our opening brief, quoted again in our reply brief, says junior indebtedness includes indebtedness that is junior by virtue of lower-ranked access to the common collateral. So there's nothing to the argument that indebtedness has to mean payment indebtedness, that subordination has to mean payment subordination. The way drafters accomplish the result of saying payment subordination is necessary is using the exact phrase they use ten times in drafting this indenture, subordinated in right of payment. Mr. Shah says that we can't point to any indenture. This is unprecedented. That's true. This language isn't in any other indenture. We point to lots of indentures that use language that accomplishes their result, but this language stands out by its contrast. That's why it's — This is the in any respect paragraph? Yes, the fourth proviso. Now, on equitable mootness, a couple of things. Charter does not stand for the proposition that we always have to go back to square one and can't unwind transactions. Quite the contrary. Charter, as quoted in our opening brief, says an appeal is not automatically equitably moot simply because the relief requested would require that a confirmed plan be altered. That's 691F3rd of 482. The unique contributions of Paul Allen to that particular plan were what gave rise to equitable mootness in Charter, not a general principle that you always have to go back to square one. The Momentum case involved equitable mootness only because there was no diligence in seeking a stay. That case is of no help to Mr. Shaw's argument either. And as a final point, as Judge Parker alluded to briefly and as our briefs explain extensively, appellees did everything they could to prevent appellate review in this case, including waiving a provision that would have required appellate review to be completed before the plan went into effect, including various timing gambits that led to not having an appealable order just on this issue. Equitable mootness is an equitable doctrine. Both courts below in denying a stay said that it was not likely to be a problem because the remedies could be recalibrated. Judge Drain said the plan would not have to be revisited. This case is not equitably moot. Thank you. Thank you very much. Thank you all. We'll reserve decision, and we are adjourned. Appreciate your arguments. Appreciate your briefs. Court is adjourned.